UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA )
VS. ) CRIMINAL ACTION
AURORA IMOGEN RUSH ) NO. 5:26-CR-297
_________________________________)

HEARING ON AUGUST 10, 2026
OFFICIAL TRANSCRIPT OF FTR DETENTION HEARING PROCEEDINGS
BEFORE THE HONORABLE MARK L. HORNSBY
UNITED STATES MAGISTRATE DISTRICT JUDGE
SHREVEPORT, LOUISIANA

APPEARANCES:

FOR THE GOVERNMENT:
AUSA SAMUEL SCOTT CRICHTON
U.S. ATTORNEY'S OFFICE
300 FANNIN STREET, SUITE 3201
SHREVEPORT, LA, 71101

FOR THE DEFENDANT:
CHARLES H. KAMMER, III
HOLLY MERRIAM
FEDERAL PUBLIC DEFENDER'S OFFICE
300 FANNIN STREET, SUITE 2199
SHREVEPORT, LA, 71101

Produced by mechanical stenography, transcript produced by computer.

JODI D. TERRY, RPR
FEDERAL OFFICIAL COURT REPORTER
300 FANNIN STREET, ROOM 4209
SHREVEPORT, LOUISIANA 71101
(318) 934-4755

I N D E X

| | PAGE |
|---|---|
| WITNESSES ON BEHALF OF THE GOVERNMENT: | |
| MATTHEW ROBERT JOHNSON | |
| DIRECT EXAMINATION BY MR. CRICHTON | 5 |
| CROSS EXAMINATION BY MS. MERRIAM | 27 |
| REDIRECT EXAMINATION BY MR. CRICHTON | 38 |
| WITNESSES ON BEHALF OF THE DEFENDANT: | |
| MARGARET AYERS | |
| DIRECT EXAMINATION BY MR. KAMMER | 45 |
| CROSS EXAMINATION BY MR. CRICHTON | 52 |

(Court commenced at 2:30 p.m. with all parties and the defendant present in the courtroom.)

COURT SECURITY OFFICER: All rise.

THE COURT: Thank you. Be seated, please.

All right. Our next matter is United States versus Aurora Imogen Rush. It is Case Number 26-CR-297. Mr. Rush is -- Ms. Rush is before the Court on Count 1, purchase of a firearm by means of false statement; and, Count 2, false statement to a firearms dealer.

Do you have a copy of the indictment, Mr. Kammer?

MR. KAMMER: Yes, Your Honor, we do.

THE COURT: Are you willing to waive reading of the indictment in open court?

MR. KAMMER: Yes, Your Honor.

THE COURT: And how does Ms. Rush plead?

MR. KAMMER: She will enter a plea of not guilty.

THE COURT: I am entering a not guilty plea to the charges against you. I am granting Mr. Kammer's oral motion for Rule 16 discovery, as well as Mr. Crichton's request for reciprocal discovery under Rule 16. There is some additional -- some discovery has already been sent out, but -- y'all can keep your seats. Some discovery has already gone out, but Mr. Crichton envisions some little extra discovery that is going to be coming shortly. So we'll set a deadline for motions of 30 days from today. That will be

September the 10th. September the 10th for motions, and then I'll meet with the lawyers in my chambers on September the 16th at 3 to discuss setting a trial date.

Now, Ms. Rush, that is a meeting I have just with the lawyers. The client doesn't attend those meetings. The sole purpose of it is for us to look at calendars and see -- I have got the calendar for the district judge and the lawyers bring their calendars and we try to find a date that works well for everybody.

And -- but, as I told you, Mr. Kammer is very experienced in these matters and I know that he will keep you fully abreast of any developments that come out of that conference. Do you understand? Sir? Ma'am, I mean?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Let's see, all right. The only other thing we're here for today is the detention hearing.

Mr. Kammer, are you ready to proceed?

MR. KAMMER: Yes, Your Honor.

THE COURT: How many witnesses do you anticipate?

MR. KAMMER: One, your Honor.

THE COURT: All right. And, Mr. Crichton, how many witnesses do you have?

MR. CRICHTON: One, Your Honor.

THE COURT: Okay. All right. Call your witness.

(Witness sworn.)

THE COURT: Have a seat, please.

MATTHEW ROBERT JOHNSON,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. CRICHTON:

Q. Will you please state and spell your name.

A. Matthew Robert Johnson, M-A-T-T-H-E-W, R-O-B-E-R-T, J-O-H-N-S-O-N.

Q. And where are you employed?

A. I am a special agent with the Federal Bureau of Investigation.

Q. And how long have you been with the FBI?

A. I have been with the FBI since 2007.

Q. Okay. And in your capacity with the FBI, do you regularly investigate issues regarding threats of national security and public safety?

A. I do.

Q. Okay. And were you or other agents of the FBI alerted to an anonymous complaint by somebody in the year 2025 regarding Aurora Imogen Rush?

A. We were.

Q. And what were, generally speaking, the content of that anonymous complaint about why someone was concerned about Aurora Imogen Rush?

A. A summary of the complaint is that Ms. Rush had made

threatening statements on social media and was a felon in possession of a firearm.
Q. Did that anonymous complaint indicate erratic behavior or behavior that disturbed this individual?
A. It did.
Q. Okay. And as a part of that, did you subsequently have to develop Aurora Rush as a person of interest in a possible investigation?
A. We did.
Q. Okay. Did you go online and look at various social media profiles and postings to see if there was anything that would have corroborated any of the information that was provided in the anonymous complaint?
A. Yes.
Q. When you examined Aurora Rush's social media posts and history, did it contain some possibly threatening statements regarding meeting violence with violence and using force to combat force?
A. I think that is an accurate description of Ms. Rush's social media posts.
Q. Okay. And would that be a rough paraphrase of what you and other officers were able to see, record, and preserve?
A. Correct.
Q. Okay. Now, this occurred in 2025?

A. This occurred in or about September of 2025.
Q. Okay. So these posts, though, as far as we're concerned and as far as you are sitting here with your training and experience in the FBI well over a decade, almost two, those would be comments and commentary by Ms. Rush that is protected by free speech; is that correct?
A. That is correct.
Q. So these threats, as opaque as they are, would they have just been concerning to you?
A. The threats, in and of themself, were concerning to me in my training and experience.
Q. And other officers; is that correct?
A. That is correct.
Q. But, again, none of these things rose to any level of an actionable crime for the Federal Bureau of Investigations to consider for prosecution?
A. I don't think that they were prosecutable, the statements themselves.
Q. But as a result of these statements and, as well as a result of certain photographs that Ms. Rush was seen in, did y'all maintain her as a possible person of interest should further radicalization or should further threats materialize in a way that was probative for an investigation?
A. We identified a particular post where Ms. Rush was holding a firearm and, because of that post and the threats,

we opened an investigation into Ms. Rush.
Q. Okay. Now, is it -- just without going into the background of Ms. Rush, was it important to you, by the anonymous complaint, that Ms. Rush was a prohibited person that was not eligible to own or possess firearms?
A. That is correct.
Q. Okay. So when you see those photographs, is it your concern, as well as the FBI, that there is a felon that is in possession of a firearm?
A. Correct.
Q. Okay. Did you all preserve those photographs?
A. We did.
Q. What types of firearms were seen in those photographs?
A. There was a semiautomatic shotgun that Ms. Rush was holding in this particular photo and in the background a pistol could be observed on a desk.
Q. Okay. Was Ms. Rush wearing any sort of specialized equipment to accompany those particular firearms?
A. Yes.
Q. What was she wearing?
A. Ms. Rush was wearing what appeared to be ballistic -- a ballistic vest, or a bulletproof vest, and was wearing a helmet.
Q. And that could also -- or could that also be the

basis for additional concern regarding her threats as to Ms. Rush?
A. It was.
Q. Okay. Now, did -- were you -- did you or other officers, subsequent to this, track down any ATF forms to see if Ms. Rush had purchased these firearms around our area?
A. We were able to develop information regarding purchases Ms. Rush made using the ATF Form 4473.
Q. Okay. And was one such form executed on or around December the 20th of 2025?
A. It was.
Q. And on that date were you able to investigate and then substantiate that investigation that Ms. Rush had gone to Bass Pro Shops in Bossier City, Louisiana?
A. We did confirm that.
Q. What did Ms. Rush do when she arrived there that was relevant for your investigation and your testimony here today?
A. She completed an ATF Form 4473 and purchased a weapon.
Q. Okay. Now, I want to talk about that weapon, and then I want to talk about that form. What type of a weapon did she purchase at the Bass Pro Shop in Bossier?
A. That was a Rossi R95 rifle, I believe.

Q. Is that a lever-action rifle?
A. Correct, a 30-30 Winchester.
Q. Now, are you aware of and do you have experience with ATF Form 4473?
A. I do.
Q. Okay. Now, in filling out ATF forms, are individuals required to make certain representations about themselves and to swear that those statements are, in fact, true?
A. Yes.
Q. Are they made aware that if they lie on these particular forms that they could be subject to a felony prosecution or subject to an investigation?
A. That is correct.
Q. Is one such portion of ATF Form 4473, Section D, 21(d), which asks whether the individual, the purchaser, has ever been convicted in any court of a felony?
A. That is correct.
Q. And on that particular date, or on or around that particular date of December the 20th of 2025, did Aurora Rush make or respond to that particular question?
A. Yes.
Q. How did she respond to that question?
A. Ms. Rush indicated she had not been convicted of a felony.
Q. Okay. Did she subsequently certify at line 22 then

and reaffirm her response that she was not, in fact, a felony (sic) and that this line on this form could subject her to a federal felony prosecution?

A. Yes.

Q. And did she sign that and date it?

A. She did sign that and date the form.

Q. Does she have a distinctive signature?

A. She does.

Q. Can you briefly describe for the Court her signature?

A. I would describe it as a star with an A in it and an R.

Q. Now, in the course of your investigation, did you eventually locate where Ms. Rush was living?

A. We did.

Q. And did you pull title paperwork in order to verify that that was, in fact, her residence?

A. Yes.

Q. And in the transfer for that particular property, did she sign it in a similar manner?

A. She did.

Q. Would that be the star as well as the cursive R?

A. Correct.

Q. Okay. Now, did you find an additional purchase on March the 19th of 2026?

A. Yes.

Q. Where was that purchase?
A. That was at DavTac Custom Arms & Ammo in Bossier City, Louisiana.
Q. And what type of a weapon was purchased at DavTac?
A. That was a Hi-Point 10mm carbine or a rifle.
Q. Is that what would be considered to be a long rifle?
A. I think it is a carbine that is a shorter version of a rifle.
THE COURT: Give me the description of the rifle again, please.
THE WITNESS: Your Honor, it was a Hi-Point 10mm Carbine.
BY MR. CRICHTON:
Q. And in purchasing this firearm, did Ms. Rush once again fill out an ATF Form 4473?
A. She did.
Q. And did she again respond in Section D Subsection 21(d) that she had, quote, never been convicted in any court of a felony?
A. She did.
Q. And did she subsequently verify and reaffirm that that statement was true in line 22, again, with that same distinctive signature?
A. She did.
Q. Okay. Now, I want to talk about whether or not Ms.

Rush is a prohibited person for the purposes of possession versus purchase of these particular firearms. Are you aware of the distinction?
A. I am.
Q. Okay. Now, in terms of her criminal history, does Aurora Rush have any prior criminal convictions in any court for any felony?
A. Ms. Rush does have a prior felony conviction.
Q. Okay. Would that be a conviction on October the 4th of 2001 where Aurora Rush, then under a different name, pled guilty in the 367th Judicial District of Denton County in Texas?
A. That is correct.
Q. And would that have been to a felony criminal charge in Texas for criminal mischief over $1,500 in the aggregate?
A. Yes.
Q. Okay. Are you aware of additional documents -- or let me ask you this. Would that felony conviction form a basis for which she should have responded on that questionnaire, the ATF form, that she had been, in fact, convicted in any court of a felony?
A. Yes.
Q. So would this make her statements that she made on those forms incorrect?
A. It would make her statement incorrect.

THE COURT: Tell me again which offense you believe she committed that was a felony.

THE WITNESS: This was criminal mischief from a conviction on or about October 4th of 2001 in the value of over $1,500.

THE COURT: Because in 2001 I am showing that she has a burglary of a vehicle.

THE WITNESS: That is a misdemeanor that Ms. Rush also pled to. She also pled guilty to a state jail felony in Texas, which is the criminal mischief that is over $1,500, Your Honor.

THE COURT: All right.

BY MR. CRICHTON:

Q. Would your understanding of comparable Louisiana law basically establish that criminal mischief over $1,500 is an aggravated form of criminal damage to property in the state of Louisiana?

A. I believe that is correct, yes.

Q. So just that you damaged a lot of property that was very valuable?

A. Correct.

Q. Okay. Are you aware of court documents that Ms. Rush filed on April the 6th of 2017 that might form her knowledge of her -- inform about her knowledge of whether or not she is, in fact, a felon and therefore, a prohibited person?

A. I am aware of those documents.
Q. On those particular -- or in those particular documents, on that particular date, did Aurora Imogen Rush acknowledge that they had a prior felony criminal conviction?
A. Ms. Rush did acknowledge in those documents a prior felony conviction.
Q. Okay. Would that have been in Subsection B-I where it says, quote, petitioner has been convicted of a felony and completed a period of community supervision or juvenile probation ordered by the Court?
A. That is correct.
Q. Okay. Now, on March the 7th of 2026 did Aurora also apply for a conceal carry permit with the State of Louisiana?
A. She did.
Q. Was she successful?
A. She was not successful.
Q. Why was she not successful?
A. That particular form asks for information about the arrest history of the applicant. It is a very wide ranging and general question, unlike the question on the ATF Form 4473.
Q. And does she answer similar to the ATF form that she did not have any prior convictions?

A. She answered no, she did not have any prior convictions or arrests.
Q. And did the State of Louisiana, in fact, catch or verify that that is, in fact, not true?
A. That is correct.
Q. Now, I want to talk about those ATF forms before we get into the search of her residence. Why weren't ATF agents able to verify and capture right at that particular moment that she made those representations in those ATF forms?
A. Because of a combination of factors. The date of Mrs. Rush's conviction and, additionally, the name change allowed Mrs. Rush's purchases to be approved in the national background processing system through which these firearm purchases are made through.
Q. Okay. Was an indictment subsequently pursued and did a grand jury there afterwards sign off an indictment charging her with two counts of making material misrepresentations to federally licensed dealers?
A. Yes.
Q. And based off of that, did you proceed getting a search warrant as well as executing an arrest warrant for Aurora Imogen Rush?
A. That is correct.
Q. Now, where did you go in order to try and locate her

to execute that warrant?
A. We served that warrant at Mrs. Rush's residence, which we had previously -- we previously discussed. We had reviewed that bill of sale and we discussed that. So we executed the search warrant at that residence which is where Ms. Rush was at.
Q. Okay. Was she ordered out of the house and did she comply with that order?
A. She did.
Q. What was her demeanor and how did she respond to officers' presence at her domicile?
A. I would describe Mrs. Rush's demeanor as uncooperative.
Q. Okay. Did you inform her that you had a search warrant not only for the property, but also for the cell phone?
A. We did.
Q. And did she subsequently comply with that -- your request for her biometric data to enter into her cell phone?
THE COURT: Hang on. I think that may be an objection.
MS. MERRIAM: Your Honor, we are going to object. We have not seen the search warrant and we have asked for our copy of it.
THE COURT: Why don't you have the search warrant?

MR. CRICHTON: Your Honor, we received a copy of the search warrant, or we had a copy of the search warrant when it was executed, and we have -- been a big bulk tender of discovery that existed prior to the search warrant being provided to them. This is just in the second tender along with the contents of the cell phone.

THE COURT: Okay. All right. The objection is overruled.

BY MR. CRICHTON:

Q. Did you subsequently execute a search warrant of the cell phone, as well as the search warrant of the house?

A. Yes.

Q. And in pursuing -- and that signed search warrant, was it -- did it provide that Aurora Rush had to provide her biometric data, if it was available, in order to provide entry into her cell phone?

A. It did.

Q. Did you attempt to try and get Ms. Aurora Rush to comply with that request to, in fact, provide that biometric data?

A. We did.

Q. Okay. When you showed her her cell phone to try to extract that biometric data, what did Aurora Mention Rush do?

A. Well, prior to that, I had handed the cell phone to

Ms. Rush to place a phone call. Ms. Rush took the phone and began to turn away from me and I could not see what Ms. Rush was doing with the phone. At a certain point Ms. Rush made a very sudden movement to her right and I believe that, at that point, Ms. Rush was going to try to factory reset the phone and destroy it, or was going to break the phone, and as result of that a short struggle ensued in which we were able to recover the phone.

Q. Did you or other officers receive any sort of minor cuts or scrapes or anything like that?

A. I received a minor scratch on my hand.

Q. Okay. So she was not -- was -- so she was not compliant with your requests to -- for her to comply with the search warrant?

A. No.

Q. Okay. Did you subsequently search the house?

A. We did.

Q. And what information, if any, did you find that was relevant for your investigation inside the house?

A. We recovered 11 firearms. We also recovered two separate sets of body armor. And in addition to Mrs. Rush's phone we seized an additional phone. We also recovered a significant quantity of ammunition.

Q. Did that number of firearms, that level of ammunition, the pieces of body armor, did that concern you

in your investigation in your experience as an FBI agent?
A. It did.
Q. Okay. And did that, in conjunction with the statements that had been made online, did that rise your -- or help increase your suspicion that she was a possible threat or concern to yourself or to other officers?
A. It did.
Q. Okay. Did she also have something that you might call or consider to be a go-bag?
A. Yes.
Q. What is a go-bag?
A. It is a bag of items that one might have prepared if they want to be able to flee or move quickly. It has a variety of uses, one of which would be, if you need to go somewhere quickly, you have everything that you need in that bag.
Q. Did you find such a bag, based on your experience, located at that property or in any vehicles?
A. We found a bag such as that in the back of Mrs. Rush's vehicle.
Q. Was it near any body armor?
A. Yes.
Q. Was it near any firearms?
A. It was near body armor. There was a firearm located in the glove compartment of that vehicle.

Q. Okay. What types of weapons did you recover and were any of them of particular concern to yourself or to other federal agents such as the ATF?
A. We recovered a number of handguns, a number of rifles; the shotgun that Ms. Rush was pictured in online. We also recovered an AR pistol that appeared to have been modified.
Q. Okay. Now, I want to talk about that modification. What types of modifications were made to that AR-style pistol? What did it make it from to what it became?
A. An AR pistol is sold with what is referred to as a brace or stabilization. Based on our examination of that pistol with the ATF, the brace had been removed from that weapon and a stock had been placed on the weapon instead.
Q. And did that modify or make what was an innocuous and perfectly legal AR pistol into something that requires special permission to have?
A. Correct.
THE COURT: It turned it into an illegal short --
THE WITNESS: Yes, Your Honor. It would turn the weapon from a compliant NFA purchase to a noncompliant short barrel.
BY MR. CRICHTON:
Q. Would that be a short barrel rifle?
A. Correct.

Q. Okay. And did the ATF confer in their expert opinion regarding the conversion of that weapon and its subsequent illegality?
A. They did.
Q. Okay. After Ms. Rush was arrested, did you or other officers become aware of some concerning jail conversations between her and friends and family?
A. We did.
Q. And in those jail calls, did she acknowledge that she had a prior felony conviction but thought that it had been expunged?
A. That is correct.
Q. And in those jails calls did she make statements about how anyone was even able to find out that she was a prior felon because of the change, the name change that she had?
A. That is correct.
Q. Okay. And did you find concerning statements in there regarding the cell phone that y'all had seized pursuant to that search warrant?
A. We did.
Q. Did you listen to a portion of that jail call?
A. I did.
Q. Okay. And did you subsequently provide that to our office for consideration in this prosecution of Ms. Rush?

A. I did.
Q. Okay. If I played a portion of it, would you be able to recognize it?
A. Yes.
MR. CRICHTON: Your Honor, I will mark this as Government's Exhibit Number 1 for authentication purposes only at this point.
(Audio played.)
BY MR. CRICHTON:
Q. Do you recognize two voices on there?
A. Yes.
Q. Is this one of the concerning calls regarding the contents of the cell phone that was taken that Ms. Rush did not want to provide her biometrics for?
A. Correct.
Q. And do you recall comments on this particular jail call at around the two-minute mark where Rush is describing a plan to destroy or remove evidence, and then subsequent instructions to a third-party to commit to that plan?
A. I believe that is reflected in this call.
Q. Okay. At this point the Government would like to publish Government's Exhibit 1.
THE COURT: Any objection?
MS. MERRIAM: No, Your Honor.
THE COURT: All right. It is admitted.

MR. CRICHTON: At the two-minute mark.
(Audio played.)
BY MR. CRICHTON:
Q. Is that one of the calls that you reviewed that was concerning?
A. It is.
Q. And in that particular call, do you recall her saying that -- the recipient of that phone call saying that she had complied and put the phone into airplane mode?
A. I think they were talking about lost mode.
Q. Sorry. Lost mode. I apologize.
A. Yes, that is correct.
Q. And do you recall that Aurora Rush responded that, quote, do you remember the instructions I gave you last year about if this ever happened?
A. Correct.
Q. And then she says, well, how do I do or complete those instructions if I don't have physical possession of the phone?
A. Yes.
Q. Okay. And in subsequent jail calls, do they make some additional statements about being concerned about that particular phone and completing those instructions?
A. Yes.
MS. MERRIAM: Objection, leading.

THE COURT: It is a detention hearing. I am going to allow it.

BY MR. CRICHTON:

Q. Okay. Now, in addition to this particular call about whether Aurora Rush or about this call where Aurora is instructing, or possibly instructing somebody to do some particular task, was anything concerning happening to the phone while you were taking it for it to be downloaded?

A. Yes.

Q. What happened?

A. The phone had -- was -- had been placed in lost mode.

Q. Okay. Did you all put it in a Faraday bag or Faraday cage?

A. I put it in airplane mode and I put it in a Faraday bag, but when I later examined it that afternoon I noticed the phone was active and it had been placed on lost mode.

Q. Okay. So did you or any other officers place it into lost mode?

A. I put it into -- I did not -- no other law enforcement officers put the phone into lost mode and I believe, based on the conversation here and from what we witnessed with the phone, that it was placed into lost mode as a result of this conversation.

Q. Was this consistent with your assessment that someone was attempting to access the cell phone?

A. Yes.
Q. Did you make expedited efforts to make sure that the cell phone was shielded from external access and that a download was unable to be received?
A. I did.
Q. And were you successful?
A. We were.
Q. Okay. Did you find anything that was -- well, let me ask you this. Are you now at the very beginnings of going through this phone?
A. Yes.
Q. Is there a lot of information on this cell phone?
A. There is a significant amount of information on the phone.
Q. Okay. Just the things that we have -- you have reviewed as recently as this weekend, were there anything that is relevant for your investigation that had elements of criminality to it?
A. Yes.
Q. What did you find, at least in your initial review of some of the small amounts of data that you have been able to get off of the cell phone?
A. Based on a review of the phone, the Alpha Maxx 5.56 pistol appears to have been purchased with a brace on it and it appears that, based on those photos, and that the 5.56

pistol now has a stock on it, that Ms. Rush -- and Ms. Rush had possession of the weapon, that Ms. Rush would have put that DPMS stock on the weapon.
Q. Okay. So this evidence, would it help support your conclusion that she had illegally modified the weapon into a short-barreled rifle?
A. It would.
Q. Okay. Are you still in the process of searching the cell phone for other possible contraband or evidence of other crimes?
A. We are.
Q. And should or had that remote third-party access to the phone been successful and you had not been able to expedite the phone to CPSO for download, would it have threatened your ability to have accessed or gotten this information and also potential future evidence that you still have not found in the cell phone?
A. It would have.
Q. Did that conclude your investigation?
A. Yes.
MR. CRICHTON: I'll tender to Defense Counsel.
THE COURT: All right. Ms. Merriam.

CROSS-EXAMINATION

BY MS. MERRIAM:
Q. Hello, sir. I am Holly Merriam. I work for the

Federal Public Defender.
A. Nice to meet you.
Q. So you received an anonymous tip in September of 2025?
A. That is correct.
Q. And have you -- have you ever spoken to the person who made that tip?
A. I have not, but the FBI did.
Q. Okay. So do you have a name for this source?
MR. CRICHTON: Your Honor, I would object. For the purposes of detention hearing, I -- asking a witness to identify confidential sources and portions of information that I believe would be in (unintelligible) discovery would be kind of highly volatile and also unusual.
THE COURT: We are not going to unmask any CIs or confidential informants in a detention hearing.
MS. MERRIAM: Yes, Your Honor.
BY MS. MERRIAM:
Q. Have you used this source before?
A. This individual was not a source. It was an anonymous complainant --
Q. So --
A. -- we then subsequently identified.
Q. Copy.
Have you spoken to the person who provided this tip

before, or was this the first time?
A. I believe this is the first time that we had spoken to this person.
Q. And you believed the tip to be reliable?
A. I believed that I was -- we, at the FBI, were able to validate some of the information in the tip.
Q. Okay. And what information?
A. We -- as we discussed earlier, that is that Rush had made some threatening statements and that Rush had posted pictures in body armor and with a firearm.
Q. And to clarify, were these threatening statements combined with the firearm or separate?
A. They were separate.
Q. Okay. So there was threatening statements which y'all deemed to be under the First Amendment?
A. Yes. I don't think they were prosecutable, correct.
Q. And then there were pictures of firearms?
A. There was one picture of Ms. Rush with several firearms.
Q. Okay. Now, the tip mentioned posts. The posts, right? And, like you said, you didn't find them to be threats?
A. Well, I found them to be threatening. I just didn't find them to be prosecutable threats.
Q. Copy.

So free speech?
A. Correct.
Q. Okay. Now, you -- are you aware that the state laws vary from the federal and firearm laws?
A. I am not an expert on state law, ma'am.
Q. Copy.
A. Yes.
Q. But it was clear Aurora was not trying to hide these firearms, correct?
A. I would probably agree with that. She posted it on social media.
Q. Copy.
And it was clear she had possession of these guns?
A. At least one from the social media post, yes.
Q. And from the tip you received in September 2025 Aurora has possessed firearms since then?
A. Correct.
Q. And you talked about the amount of firearms, correct?
A. We did discuss that.
Q. In Louisiana it is not really uncommon for people to have a lot of firearms, is it?
A. It's not.
Q. In Louisiana it is not uncommon for people to have a lot of ammunition, is it?
A. No, it's not.

Q. And so why did that raise a concern?
A. I think when you look at the totality of the circumstances, that Ms. Rush had admitted in a court filing that she was a convicted felon, the nature of the threats. As the investigation progressed, we also identified other statements that Ms. Rush made that were also threatening.
Q. But statements that were protected by the First Amendment, correct?
A. Yes. Yes. But I want to make the distinction that these statements were advocating or calling for violence on behalf of an ideology.
Q. But you found they were not prosecutable, correct?
A. That is correct.
Q. Now, let's go talk about that felony. That occurred in 2001, correct?
A. It did.
Q. About 25 years ago?
A. That is correct.
Q. It involved damage to property, right?
A. It did.
Q. It didn't involve harming another human?
A. No.
Q. And if this case had been expunged, would that felony have come up during a criminal background check?
A. I don't know if it was expunged or not, but it came

up during our check.

Q. But if it had been expunged, do you know if it would show up during a criminal background check?

A. I don't really know.

Q. Okay. Now, you executed a search warrant on the house?

A. That is correct.

Q. And so we have not seen the search warrant and so I want to ask some questions about it. Before then, before you got the search warrant, was any other warrant obtained?

A. Yes.

Q. And what kind of warrant was that?

A. We had a warrant to monitor Ms. Rush's cell phone.

Q. Was it a ping warrant?

A. Yes. But it is referred to as a three-in-one warrant, yes.

Q. Okay. And what is a three-in-one warrant?

A. It gave us access to Ms. Rush's historical phone records, to her subscriber information, and to prospective hits on her cell phone.

Q. Copy.

Was a track and trace issued?

A. A track and trace was also issued, yes.

Q. (Unintelligible)?

A. Correct, yes.

Q. Was there a wiretap?
A. No.
Q. Okay. And what was the basis of the ping warrant with all of the cell phone monitoring?
A. The false statements to a federal firearm license dealer.
Q. Okay. And do false statements to a federal firearm dealer usually give you access to somebody's entire phone?
A. I don't know if I could say that those are usual in my line of work. It is varied and different and each case is unique, so...
Q. Okay. Now, regarding this search warrant, can you describe the house for me?
A. It is a small structure. I would describe it as a trailer.
Q. How big would you say it is?
A. Twenty-five by 25 maybe. It is very small.
Q. How many rooms in there?
A. Two rooms.
Q. Back room, bedroom, kind of thing?
A. A bedroom and a living area.
Q. Okay. And how big was the property as a whole?
A. I believe it is about a half acre.
Q. And did you give the warrant to Aurora when you got there?

A. We eventually provided the warrant to Ms. Rush.
Q. Now, you talked a lot about the go-bag, but really it is kind of an emergency kit, correct?
A. I don't want to be seen as argumentative, but it was an emergency kit with body armor and a firearm. I think the context is important.
Q. But body armor is not illegal?
A. It can be.
Q. Is it illegal for Aurora to have it?
A. Under Louisiana state law I know earlier I acknowledged I am certainly not an expert of Louisiana state law, but I believe it would be, based on Mrs. Rush's conviction that we mentioned earlier, that it would potentially be unlawful for Ms. Rush to possess that.
Q. But you don't know?
A. I think I am right, but I'll defer to you guys.
Q. Now a go-bag is usually packaged with basic survival kits, items?
A. Correct.
Q. And this bag had survival items like water in it, correct?
A. Yes.
Q. And if somebody is attending political events often they would probably want a bag that has stuff like water in it and that would be useful and other emergency equipment?

A. Correct.
Q. And would it surprise you that the United States Department of State has a list for what to pack in a go-bag?
A. It would not surprise me, no.
Q. Would it surprise you if they had a list for what to pack in a stay-bag?
A. No.
Q. Okay. Now, you said that the go-bag there were firearms near it, correct?
A. Well, there was a firearm in the glove compartment. The go-bag was in the back of the vehicle.
Q. But it is correct that the property isn't very big, right?
A. Well, the what is not? Say that again.
Q. The property. The property, as a whole, was not very big.
A. The living area. But, I mean, the property was half an acre. The living area was very small.
Q. Was the car near the house?
A. It was parked in front of the house.
Q. Okay. So it was pretty close, though, everything was close together?
A. That is correct.
Q. Now, I want to talk about the recording. Now, there is a lot of reasons people don't want law enforcement

looking at their phone, correct?
A. Right.
Q. Maybe somebody could have made an unkind statement about their friend; there could be sensitive photos, correct, about -- of someone or a significant other?
A. Yes.
Q. And if somebody is helping immigrants in hearings there may be sensitive information about that on a device; is that correct?
A. Yes.
Q. And would you agree there seems to be a lot of chaos and confusion concerning immigration matters right now?
MR. CRICHTON: Your Honor, I am going to object at this point. I think that is outside the perimeters of this particular detention hearing. We are far afield, at least by my estimation.
THE COURT: To a bit.
MS. MERRIAM: Your Honor, this is -- they brought up the phone and I am simply exploring why Aurora might not want somebody to look at their phone.
THE COURT: Yeah, I will give you a little leeway.
MS. MERRIAM: Thank you, Your Honor.
BY MS. MERRIAM:
Q. Would you agree there seems to be a lot of confusion and chaos?

A. Sure, I would agree with that.
Q. And given that chaos, would you agree it is not surprising that somebody who assists immigrants would want to keep that information private?
A. I could understand that.
Q. Now, would you say Aurora is a danger to the community?
A. I don't think that is a judgment for me to make. But if you really want me to make it, I can certainly give you my opinion.
Q. What would be your opinion?
MR. CRICHTON: Judge, I think that is calling for speculation to offer his opinion about Aurora Rush and whether she is a danger to the community.
THE COURT: I am going to allow it.
MR. CRICHTON: Yes, sir, Judge.
THE WITNESS: I think given the statements that were made, even though they are constitutionally protected, some of the false statements that were made, the collective evidence, as a whole, I have some concerns about Ms. Rush and, in particular, of the attempts to obstruct the case and destroy evidence.
BY MS. MERRIAM:
Q. And you would have these concerns even though this investigation started almost a year ago and Aurora has been

out since then?

A. That is sort of a historical question. We're talking about whether Ms. Rush is a danger to the community going forward and I think, based on the evidence, that Ms. Rush could be a danger to the community.

Q. Would you not agree that historical matters play into that question?

A. I agree historical matters play into that question.

Q. Would you say Aurora is a flight risk?

A. Included in the original complaint, the anonymous complaint, was a statement that Ms. Rush would flee to Mexico. I think that I have some concern that Aurora Rush is a flight risk. I believe she -- that Ms. Rush has a passport and I believe that she is fluent in Spanish.

Q. If that passport is taken, would you have a concern?

A. My understanding is you can cross the border on foot without a passport, so I would still have some concerns.

MS. MERRIAM: Your Honor, may I have a minute?

THE COURT: Sure.

MS. MERRIAM: No more questions.

THE COURT: All right. Redirect?

MR. CRICHTON: Yes, sir, Judge.

REDIRECT EXAMINATION

BY MR. CRICHTON:

Q. Defense Counsel led off with asking about the

commonality of certain types of behaviors. For example, is it common in the state of Louisiana for people to own or possess firearms. Do you recall your response?
A. I believe I said it is common to possess firearms in the state of Louisiana.
Q. In your experience, is it common for those individuals to lie on federal forms?
A. It is not common for those individuals to lie on federal forms.
Q. Now, why, as an FBI agent or as an ATF agent, in either of those federal capacities, would you or other officers be concerned about someone lying on a federal form?
A. It is concerning on a number of levels. If the individual had told the truth they would not be able to obtain the weapon lawfully, and then it leads to a series of questions about why does this person need to lie to obtain something that they would otherwise be prohibited from obtaining.
Q. Okay. So but for her material misrepresentation she would not be able to own or possess those firearms that you witnessed in photographs subsequently, correct?
A. Correct.
Q. Now, Defense Counsel also asked about the commonality, again, of weapons and how common they are in the state of Louisiana. Is it, again, common for them,

individuals in the state of Louisiana, to have illegally modified weapons?
A. I don't believe it is.
Q. Okay. Is it common for ordinary citizens to possess large amounts of body armor and ammunition?
A. I don't think it is, no.
Q. And, again, in terms of Defense Counsel's questions of commonality, is it common to go onto social media spaces and call for violence against various groups of people?
A. No.
Q. Okay. Now, Defense Counsel asked about a go-bag and the Department of State's suggestions for what might be useful in such a go-bag. Do you believe that body armor and weapons are typical in the State Department's description of what is proper in a go-bag?
A. I do not believe that that is a recommendation of the State Department.
Q. All right. In terms of your search of the cell phone, are you just at the very beginning of your search?
A. We are.
Q. Why are you just now at the very beginning?
A. With this search and the arrest, which only happened on Thursday, there is a significant amount of work that has to take place and a review of the cell phone will take some time.

Q. Okay. Defense Counsel pointed to some possible legal documents for the speculation that there might be something in there that is perfectly legal, but that someone, an everyday Joe or any other private citizen may not want the federal government to have. Do you agree with that statement? That there might be things that are innocuous on a cell phone that people might --
A. Yes, I agree with that.
Q. I could be embarrassed about what is on my cell phone and I may not want you to have it; is that correct?
A. Right. Absolutely.
Q. But so far in your investigation, have you found things that are probative of not only the federal crime for which you are investigating but also future federal possible crimes?
A. That is correct.
Q. And so far in the beginnings of this investigation have you been able to find and substantiate that Ms. Rush illegally modified a weapon into a short-barrel rifle?
A. Yes.
Q. Is that an additional prohibited federal felony?
A. It is.
Q. Did you also substantiate that she would have possibly lied on a number of additional federal forms that would subject her to additional federal felony charges?

MR. KAMMER: Objection. Calls for speculation.
THE COURT: Can you rephrase?
MR. CRICHTON: Yes.
BY MR. CRICHTON:
Q. Did you find evidence on the phone that would substantiate that she possibly lied on other federal forms?
A. Yes.
Q. And would that be the basis of additional possible referrals for federal prosecution for additional felonies?
A. Let me correct that. I think on the phone there is evidence of other purchases that we have not yet obtained the ATF 4473 for.
Q. Okay. As Ms. Rush sits here today, is she a -- or what would be considered to be a 922(g) prohibited person for the purposes of felon in possession of a firearm?
MR. KAMMER: Objection. Is he qualified to make that decision with the current existing law, along with this criminal mischief charge?
THE COURT: Do you know the answer?
THE WITNESS: Are we talking about Ms. Rush's felony conviction in light of the case law and whether she can possess as a felon in possession?
BY MR. CRICHTON:
Q. Yes, that is exactly what I am asking, whether she -- for example, you saw her in 2025 that she was holding a

firearm?
A. Correct.
Q. Based off of your understanding of -- and directives for how the FBI and ATF investigate those crimes, are you aware of the types of felonies for which a person might be a prohibited person and unable to physically possess those types of weapons?
A. Of course, yes.
Q. And isn't it -- is that true that Ms. Rush, based off of that criminal condition in the Fifth Circuit, that is not a current crime that you believe would make her a 922(g) individual?
A. That is correct.
Q. Now, that actually accrues to her benefit; is that correct?
A. It does.
Q. Okay. So in 2025 when you just see her with a weapon, that is not as concerning; is that right, as if she had --
A. Yes. And since we saw Ms. Rush with a weapon in late 2025 the case law has changed and I think now we can agree that it is probably not a violation of 922(g).
Q. And then subsequent to that, as recently as in the last couple of months, were you able to substantiate the federal line on those charges that you are here today

testifying about?
A. We were.
Q. Okay. In terms of flight Defense Counsel asked you a number of questions. You indicated that you're -- you have some level of knowledge of Ms. Aurora Rush's fluency in other foreign languages. What languages is she fluent in?
A. I believe Ms. Rush is fluent in Spanish.
Q. Okay. And did that, as well as your understanding of the anonymous complaint saying she was going to be a possible flight risk to go to Mexico, did that raise the level of concern for you, in addition, to the go-bag and other things that you found that she might be a flight risk, as well as a danger to herself or to others?
A. Yes.
Q. Okay. Thank you.
THE COURT: Let me ask a question.
THE WITNESS: Yes, Your Honor.
THE COURT: When we were listening to the phone call Ms. Rush gave the other person on -- the other line made -- she made a statement that, I have given you instructions earlier in case this ever happened. Do you have any -- do you draw any significance from that?
THE WITNESS: Yes, Your Honor. I think that Ms. Rush is telling the caller that they had previously discussed erasing Ms. Rush's cell phone if she were to be

taken into custody by law enforcement, or if the phone was to be taken into custody by law enforcement.

THE COURT: All right. Anybody have any other questions for the witness?

MR. CRICHTON: Nothing further from the Government, Judge.

MS. MERRIAM: No, Your Honor.

THE COURT: All right. Thank you, sir. You can step down.

MR. KAMMER: Your Honor, I would call Margaret Ayers to the stand.

COURTROOM DEPUTY: Raise your right hand.

(Witness sworn.)

THE COURT: All right. Be seated, please. And you can scoot up a little bit towards that microphone. You don't have to get right up on it, though.

THE WITNESS: Okay. And I apologize. I have got allergy voice, so I am not --

THE COURT: You're doing fine.

THE WITNESS: Okay.

THE COURT: You're doing fine.

MARGARET SUSAN AYERS,

having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KAMMER:

Q. If you will just look at me so we can talk back and forth. Go ahead and give the Court your full name.
A. Margaret Susan Ayers. M-A-R-G-A-R-E-T, S-U-S-A-N, A-Y-E-R-S.
Q. And your address, please?
A. 3253 Green Terrace Road, Shreveport, Louisiana 71118.
Q. How long have you lived in Shreveport?
A. Nine years.
Q. And have you known Ms. Rush?
A. Yes, I do.
Q. And how do you know her?
A. She is a friend of mine. We've met through some ministerial work that I do and she is -- she uses me as her chauffeur and she is a translator and we do stuff together in that regard.
Q. Okay. And when you say you do stuff together, what do you do for a living?
A. I am an Episcopal priest and aside on my -- in my free time I have been working with some other areas of ministry, including Hispanic ministries.
Q. Okay. And explain a little bit more how that ties in with Ms. Rush.
A. She is a translator. She is very fluent in Spanish, and so we have been working with people in the community regarding their situations with detention and the like. We

also go and do --

THE COURT: Immigration type stuff?

THE WITNESS: Yes, yes. Yes, sir. Your Honor. Sorry. But, yes, we do immigration work. We've gone on the request of people to visit people in detention and to bring back information to the family, as to some how they are and how they are holding up. Sometimes just the medical concerns that we talk to them about and just kind of get -- make sure they are doing okay, because many people live very far away from their loved ones and can't get in to visit with them. And we also go to one detention center where we -- they have a picnic that you can have once a month for detainees and we have been doing that as well.

BY MR. KAMMER:

Q. So talking about Ms. Rush, how long have you and her been doing this?

A. About a year.

Q. And do you -- how often do you travel with her a month?

A. We go to detention centers a couple of times a month. We've gone to help people with their interpretation needs, hearings and the like, and that is a couple of times a month as well. And then sometimes -- oh, actually, some of the visitations, the visitations picked up because more and more people are asking for her to go and visit people in

detention, that is -- it is a lot.
Q. And does she do this around the state?
A. Yes.
Q. And you help her get there?
A. I am her driver. Her current car does -- well, she didn't have a car for a while. They only had one car, and then somebody donated one and it has got a huge -- over 100,000 something miles and she doesn't feel it is dependable. So she -- and she doesn't drive long distances either.
Q. Okay. And where are some of the places you guys regularly attend?
A. We've gone to (unintelligible) detention center a lot. We've gone to Jackson detention center. We've gone down to numerous hearings in St. Rosa -- Rose and New Orleans.
Q. Have you and her also went to protests?
A. Yes, we have.
Q. All right. And some of the places you have been on that with her?
A. We have been down to Alexandria a couple of times. We were -- yeah, we've got some other ones down in Alexandria. And I have also -- I think we went to one in New Orleans, but I can't be sure.
Q. And during those protests, were they violent protests

or --
A. Oh, no, no. They are people coming up and expressing their opinion. A lot of them have to do with they were talking about different situations, and so they've come for people -- jurisdictions to talk -- well, the airport in Alexandria, and we've gone before the boards to show support for people not wanting ICE to be using that facility and, also, speaking on behalf of different people, too.
Q. Are these quiet, peaceful demonstrations or very aggressive? How would you describe them?
A. People are emotional, but there is no aggression. There is no physical violence involved with it. These are emotionally charged things on both sides and people get -- have a stake in it and they are very important and so they get very agitated and emotional and talk loud and -- but there has never been any violence. I have never seen her involved in any violence. We have protested against violence done to people through ICE situations as well.
And, yes, they are -- being on the side of the coin that I am on, I am very much against it and we'll talk smack about it, but we've never ever discussed violence or doing any violence. And I have no intention and I don't believe she has any intention of doing that either.
Q. Okay. Any at any of these protests is she walking around with a big assault rifle?

A. No, no, no.
Q. No guns?
A. No. The only time -- she has shown me her guns, but we both come -- I come from Montana and she grew up in Nebraska and so we both were raised around firearms and so it was kind of that type of thing. I have a handgun that my brother would not give to me while he was alive because he was sure that I would not be able to use it and he would probably be correct.
Q. Okay. And I think you have already said that, but lawyers like to ask things several times, but, in your opinion, being around her, you think she is a very peaceful, loving individual?
A. Oh, yeah, yeah. I think, like all of us, she might get into a sparked conversation about things, but I have never seen any indication of her wanting to draw down on anybody or anything like that. The guns were, as far as I knew, for recreational purposes. She has never mentioned anything about being violent to other people or --
THE COURT: Do you follow her on social media?
THE WITNESS: Some of it, yes.
THE COURT: You follow her on social media?
THE WITNESS: Yes.
THE COURT: Were you aware of the post that we have discussed here; did you see that post where --

THE WITNESS: Yeah.

THE COURT: -- she is meeting force with force?

THE WITNESS: Yes.

THE COURT: That is about ICE, isn't it?

THE WITNESS: Yes. But it is not about violence. She is not going to --

THE COURT: She is holding a picture of herself with a gun with a helmet and saying we're going to meet force with force?

THE WITNESS: I don't think that is the con -- I don't remember that being the context of the picture.

THE COURT: Well --

THE WITNESS: I think that --

THE COURT: -- in front of you?

THE WITNESS: No. I am saying I have seen her in pictures with arms and I have seen her rhetoric about meeting force with force, but when we talk about the use of firearms she has been very reticent about that and also has said that she is more fearful now than ever because of some of the situations where it has been turned against where people who have had the right to defend themselves, seemingly that is taken away from them. So she did not believe that even in a situation where you would have, like, castle law, that that would apply to her because of her trans -- being a trans woman. But there is so much violence

against trans women that she was afraid of being assaulted, but that she is worried because of a situation that happened in Wyoming where a woman, a trans woman defended herself and was then brought up on charges. She is really anti even defending herself at this point. She has really questioned in the last conversations we had. And that was last week.

THE COURT: All right.

MR. KAMMER: Thank you. I appreciate it. You can step down -- oh.

THE COURT: Cross.

MR. CRICHTON: I have a few questions.

THE COURT: Sure, go ahead.

CROSS-EXAMINATION

BY MR. CRICHTON:

Q. Margaret?

A. Yes, sir.

Q. Sorry. Sorry I have to ask you a couple of questions, if that is okay with you. I wish --

A. No, that is okay.

Q. -- it was under more auspicious circumstances.

A. Yeah.

Q. So I beg your patience.

A. That is your job.

Q. You indicated to Defense Counsel, Mr. Kammer, that you are aware of some of her social media postings and

things like that that she has, but not all of them?
A. I can't say I keep up on all of them.
Q. Okay. Are you aware of a post from her where she says, quote, "we are at war with the growing class, pick up a weapon and fight or get the fuck out of the way -- or get the fuck out of my way. We can settle our differences later."
A. Yes. But I would not -- but I know her and I know that she would post that, not be serious about it, which is not what other people reading it would assume.
THE COURT: You assumed it was a joke?
THE WITNESS: As much as other people or folks that post things like that on their social media.
THE COURT: I am not worried about other people. I am worried about Ms. Rush.
THE WITNESS: I think she is saying it to make a point, but I don't think she would do anything like that. I think she is making --
THE COURT: Not holding a gun, pointing it at the camera, wearing a helmet --
THE WITNESS: Excuse me, Your Honor. But I am not sure that those two were put -- were done together.
THE COURT: Well, you may know more about -- you know more about her social media than I do.
THE WITNESS: I do not believe that those two were

-- were those two images posted side by side? Was that next to her posing with the gun?

MR. CRICHTON: I believe this is a Twitter or social media post of just words, Your Honor.

THE COURT: Okay. All right.

THE WITNESS: Yeah, that is what I am saying, which --

THE COURT: Okay. As I said, you know more about it than I do.

THE WITNESS: Yeah, yeah. I did not see. When she poses like that, that is her country upbringing as far as we have talked about which poses with guns and the like. That is the kind of macho type of thing that I was raised in.

THE COURT: Read that post again to me.

MR. CRICHTON: Yes, sir, Judge. "Pick up a weapon and fight or get the fuck out of my way. We can settle our differences later."

THE WITNESS: And I know what you are saying, but I am also saying that people, in the heat of moments in posting on social media that don't mean that they are going to come out and fire arms at people.

THE COURT: I understand. I have got to work with what --

THE WITNESS: I know, I know. I understand, Your

Honor.

THE COURT: Some other people --

THE WITNESS: No.

THE COURT: -- somewhere else --

THE WITNESS: I understand.

BY MR. CRICHTON:

Q. Margaret, are you aware of another --

THE COURT: Ms. Ayers. Ms. Ayers.

BY MR. CRICHTON:

Q. Sorry. Ms. Ayers. I apologize.

A. Can I be Reverend?

Q. You can be Reverend.

A. Thank you.

THE COURT: That is even better.

BY MR. CRICHTON:

Q. Reverend, are you aware of a post from Aurora Rush where she posted, quote, "They wanted violence. Now they get what they wanted. They all deserve every single bit of it that comes their way. And I do mean all of them." And all is in all caps. Are you aware of that post as well?

A. Yes.

Q. Okay. I understand that you previously stated to the judge that you are not as concerned about these posts knowing Ms. Rush; is that correct?

A. That is correct.

Q. Do you also understand that other people might be concerned about that not knowing Ms. Rush?
A. I understand that because I have read other people's posts on social media and been terrified by them, so, yeah. And I don't know them.
Q. Thank you, Reverend. Thank you for your outreach. I have no further questions. I appreciate it.
A. Thank you. Yes, sir.
MR. KAMMER: No other questions.
THE COURT: Thank you, ma'am. You can step down.
THE WITNESS: Thank you, Your Honor.
THE COURT: All right. Let's have some brief argument.
Mr. Crichton, you have the burden. Why don't you go first.
MR. CRICHTON: Yes, sir, Judge.
Originally, I note that the Government originally was not asking for detention. At the very beginning of its investigation it long considered this to be a paper crime of lying on federal forms. However, there were a number of things that changed during the course of its investigation and absolutely changed after the search warrant that changed our opinion, the FBI's opinion, and I would now urge the Court's opinion to change as well regarding this detention.
I acknowledge that I do carry the burden. There is

no presumption for continued detention pending trial. However, I want to highlight a couple of things that have been of concern to me that I hope are as concerning to the Court. The first of which is the witness, FBI Agent Matthew Johnson, highlighted the view of -- the way I view it, very similar to him, which is from the totality of all of these circumstances together, the volatile social posts on social media calling for violence, call to arms, as it were, while certainly being protected speech, does become of a more concerning nature and gray in light of a number of different things that we have found during the course of this investigation. In excess of ten firearms, one of which is an illegally modified short-barrel rifle for easy concealment. That was of particular concern because it forms the basis for an additional and possibly forthcoming federal offense with very serious jail time that comes with it.

In addition to that, the high amount -- the large amounts of body armor, hundreds of rounds of ammunition, and perhaps most concerning to the Government in all of this was that when Ms. Rush was confronted with her cell phone and asked to surrender and given an opportunity to do so, to cooperate and to show some level of modicum of participation with the process, she elected not to. She turned away, became fervent with the phone and attempted to try and do

something which was consistent with law enforcement's experience of trying to destroy, alter, or delete information that was on the cell phone.

Now, to buttress that or help support our determination that that is, in fact, what was happening, after a struggle that occurred over that cell phone in which one of officers was minorly injured, not the basis of any sort of federal concern, but of note for relevance in terms of her level of cooperation with the process.

We discovered on jail calls that she was attempting to try and instruct people because she was ready for this day. And that is what I want to highlight. She, over a year ago, when she started making these posts, posting pictures of herself in body armor with firearms saying a call to arms, a call to violence, that they wanted violence now they are going to get it, had made instructions, long-standing instructions in anticipation of this day. Much like that go-bag, that they were going to have to do certain things, including deleting things off of her cell phone and trying to remotely wipe it. The call is as black letter as it can possibly be. You have received those instructions in the past; are you able to carry them out. Fortunately, there was a Faraday bag and, fortunately --

THE COURT: There was a what? I am sorry.

MR. CRICHTON: A Faraday bag, Judge.

THE COURT: Okay.

MR. CRICHTON: That remotely insulated the cell phone and prevented it from being able to have outside interference. It basically locks in like a lead pouch that prevents signals from going inside the bag.

They were successful in getting it turned into lost mode, which would have resulted in possible deletion, but for the actions of the FBI and expediting it over to CPSO where they were able to promptly download it in safe conditions where they could not interfere with it anymore.

And what I told to Defense Counsel and our position to the Court is one of our greatest areas of concern is that if she is able to participate in this level of obstruction, a felony obstruction punishable by up to 20 years of hard labor while she is incarcerated, then she is going to be able to do a lot more than that when she is out. It shows a lack of respect for the process. It shows a high degree of concern for the community and safety risks, as well that it shows possible flight risk.

Defense Counsel attempted to highlight, I think, that the FBI agent, Johnson, was able to respond fairly eloquently that she is fluent in Spanish. She works with migrant communities that have international ties and are not from here, and that she has in the past indicated, at least based off of an anonymous complaint, that she would flee if

she was ever targeted for prosecution for any of these repercussions.

THE COURT: I don't put very much weight on something that a confidential informant who I know nothing about the reliability. You know, they were right about making threats on social media and being a felon, but suggesting that in that one phone call she was going to flee to Mexico, I just need more for that. I don't think she is a risk of flight based on what I heard here today.

MR. CRICHTON: Yes, sir, Judge. And understanding that, I certainly would say she is a risk to the community, though, based on our investigation, the number of firearms, the calls to violence, the illegally modified weapon, and the obstruction of -- this is, again, just the beginnings of the federal government being able to examine her cell phone for possible evidence. But for the actions, the quick actions of the FBI and CPSO that evidence would have been deleted and she would have been successful on deleting her records. And for that reason I would submit that she should be in detention pretrial pending further evidence or discussion, anything else that can kind of supplant that she is not a risk to the community, which I just don't think that basis exists here yet. I have seen her social media posts and that, while protected free speech, in conjunction with everything we have seen, the

body armor, the number of weapons, the illegally modified short-barrel rifle, and the obstruction are highly concerning to me and I would submit should be concerning to the Court as well.

THE COURT: All right.

MR. CRICHTON: Thank you.

THE COURT: Mr. Kammer.

MR. KAMMER: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. KAMMER: You know, we go back to 2001 when she was 18 years old that was her first and only felony criminal mischief and now we're here 25 years later and she has been essentially clean of all charges. I think she has a small misdemeanor, but nothing serious since that date.

You know, most of this hearing was about the threats, but every time the Government mentioned the threats they readily admit they are perfectly legal and anyone that watches TV knows that our leaders do worse. You know, I believe that there is a condition --

THE COURT: There was a call to violence, if you will, with meeting force with force.

MR. KAMMER: Right. But that is just social media BS. I mean, there is no -- she is not, like, saying, I am going to come, you know, to U.S. Senator's house who lives on this street and I have got a plan.

THE COURT: I get that.

MR. KAMMER: Yeah. I mean, none of that is there. She is just talking to the universe. You know, we have received no evidence that people responded to it, people engaged in it, does she have a social media group. I don't know. But, you know, all I know is these threats are legal and acceptable, unfortunately, in these times.

THE COURT: Well, I am not quite sure that they are as legal as you want them to be. These are things that could cause someone else who is a follower of Ms. Rush to motivate them to take action. I mean, words have consequences.

MR. KAMMER: And I agree with you a hundred percent, they do. But, you know, these are, like I said, I mean, they are very opinionated, but they are legal. And I understand what you are talking about.

Now, you know, the Government talks about guns, ammunition, and I agree with my co-attorney and, you know, this is the South. I mean, if you have 12 guns that is nothing. I mean, there are people that have substantially more ammunition and more guns.

THE COURT: But are they felons?

MR. KAMMER: No.

THE COURT: That is big difference then, isn't it?

MR. KAMMER: I do understand that. But, like I

said, she could -- there was no evidence that she was carrying them out in public; that she actually, you know, threatened someone with a gun. Right now we still have a paper case. She lied on her gun form. This is what this case is ---

THE COURT: No, no, no. The car --

MR. KAMMER: Yes, but I don't think the car worked. I don't think it went anywhere, you know. And I understand. But, like I said, you know, it really hasn't wrapped their hand around any reason why she is a danger to the community.

THE COURT: Okay.

MR. KAMMER: Like I said, you can give her house arrest. You can give her a GPS monitor. And a computer, social media.

THE COURT: If she is telling someone to follow the instructions that I gave you in the event this ever happened tells me that this was a plan. If this ever happened she was going to be prepared for that. You need to be able to delete my phone or fix my phone or do something with my phone in the event this ever happened and it happened and she is on a jail call telling people to do that. That is obstruction of justice, which is a another felony. Right?

MR. KAMMER: Potentially, yes.

THE COURT: Potentially, yes.

MR. KAMMER: But, you know, we can only interpret the call. I mean she could be, like, she could have sensitive information about immigrants that she didn't -- doesn't want the Government to see or find out about it. It could be perfectly legal. We just don't know.

THE COURT: Well, we will know when they finish looking at that phone --

MR. KAMMER: Yes.

THE COURT: -- that they were able to lock, but not able to delete.

MR. KAMMER: I understand. Thank you.

THE COURT: All right. Based on the totality of the circumstances, I find that the release of Mr. -- Ms. Rush would constitute an unacceptable danger to the community. She -- again, looking at it from the totality of the circumstances, she makes a post that is a call to arms, fight -- meet violence with -- or meet force with force. I suspect that was probably aimed at police, ICE, who are out there trying to arrest immigrants. She had an illegal modified rifle, more than one body armor. She was uncooperative. She tried to destroy or delete her phone and said, you know, if you want violence, they are going to get it. I think that shows a total lack of concern for others.

But I am also very concerned about the obstruction of

justice. She could very well be charged with obstruction of justice, charged with being a felon in possession, charged with -- I mean, there is a number of things here. And the Government has indicated that they do intend to file a superseding indictment and add additional charges.

I appreciate the Reverend's comments and concerns. I think she has interpreted the situation in the light most favorable to Ms. Rush, which I would expect her to do, but, you know -- and I know that there are people in this courtroom who care greatly for Ms. Rush who don't want to see her have to be held in jail. But if she is doing these things while she is in CCC, or whatever jail she is in, imagine what she would do if I put her on a home confinement or an ankle bracelet. She would be free to do anything. She can't have guns in her home, but she has got at least 11 of them.

So, you know, again, this is a -- these are hard facts. We will know more later about what was on the phone and why Ms. Rush didn't want anybody to see it. I doubt seriously it has anything to do with other than the posts and the other texts and other calls and stuff that were made in connection with this call to arms.

Words have consequences and they have serious consequences. And there is just no way that I can let Ms. Rush out. So she will have to stay in the custody of the

marshal pending further proceedings in the case.

Anything else, Mr. Kammer?

MR. KAMMER: No, Your Honor. Just note our objection.

THE COURT: I have got your objection noted.

Anything else, Mr. Crichton?

MR. CRICHTON: No, sir, Judge.

THE COURT: All right. Court is adjourned.

COURT SECURITY OFFICER: All rise.

(Court concluded at 4:05 p.m.)